Phyllis W. LOSS, Plaintiff,

v.

The MUTUAL LIFE INSURANCE COM-
PANY OF NEW YORK, Defendant.

United States District Court
S. D. New York.

July 22, 1963.

Joseph Kopelman, Brooklyn, N. Y., and Kleiger & Kleiger, New York City, for plaintiff; Leon Wasserman, New York City, of counsel.

Richard I. Fricke, New York City, for defendant; Carl F. Hollander, New York City, of counsel.

McLEAN, District Judge.

This is an action to recover the face amount, less an outstanding loan, of a life insurance policy issued by defendant upon the life of plaintiff's late husband, William Loss. Plaintiff is the beneficiary named in the policy. The defense is that the policy lapsed prior to the death of the insured because of his failure to pay premiums. Jurisdiction is based upon diversity of citizenship. The parties have stipulated that New York law applies.

There is no dispute as to the relevant facts, which I find to be as follows.

On October 29, 1956, defendant issued a term life insurance policy, No. 798-04-42, in the face amount of $50,000 on the life of William Loss. The policy gave the insured the right of conversion. On August 27, 1957, on the application of the insured, the policy was converted to the policy here involved, a limited payment life policy No. 823-57-67, also in the face amount of $50,000. The conversion was made effective as of May 18, 1957, which thereupon became the "policy date." The policy provided for a semi-annual premium of $1,263.50 payable on May 18 and November 18 of each year during the life of the policy, which continued until May 18, 1999 unless sooner terminated by the death of the insured or otherwise in accordance with the policy terms.

The first premium due as of May 18, 1957 was paid, partly in cash and partly by applying the surrender value of the

previous term insurance policy. When the next premium came due on November 18, 1957, Loss borrowed $1,072.95 from defendant on the policy and added to it $190.55 of his own funds in order to make up the total of $1,263.50. Loss signed a loan agreement to evidence the loan, which provided that he assigned the policy to the defendant as security for the loan and that any indebtedness under the agreement should be "automatically repaid to the Company out of the cash value of the policy" in the event that the policy was surrendered or if there should be a default in premiums or "if the indebtedness becomes equal to or greater than the cash value." The agreement provided that the loan would bear interest at the rate of 6 per cent per year, payable on each policy anniversary, and if not paid when due, it would be added to the principal. The loan agreement further provided:

> "If on or before any policy anniversary the indebtedness equals or exceeds the cash value of the policy, the policy shall terminate thirty-one days after notice has been mailed to the last known address of the insured * * *."

On April 30, 1958, defendant mailed to Loss a printed "Notice of Amount Due" stating that on May 18, 1958 there would become due a premium of $1,263.50 plus loan interest of $22.19, making in all $1,285.69. The printed notice stated that unless this amount were paid on the due date, or within 31 days' grace period thereafter, "the policy and all payments on it will become forfeited and void, except as to the right to a surrender value, paid-up policy or continued term insurance when provided by statute or in the policy."

On May 2, 1958 Loss wrote to defendant inquiring how much he could borrow "against value in the policy as of May 18, 1958." To this inquiry defendant replied on May 8 stating that it would be "glad to arrange a loan to pay the premium due May 18, 1958," and that a payment by Loss of $730 plus loan interest of $22.19 would "complete this transaction." Obviously the difference between the premium of $1,263.50 and $730, i. e., $533.50, was to be the amount of the new loan.

Defendant apparently made an error in this computation for, on May 20, 1958, the manager of the branch office of defendant, who seems to have known Loss personally, wrote to him stating that he had asked the home office to send Loss a loan blank and that if Loss wished to borrow to cover the current semi-annual premium, he would need to put up $480.98 in cash "to continue your policy in force to November 18, 1958." Even this figure was not entirely accurate, for on May 21, defendant's home office wrote to Loss saying that the correct cash amount required would be $467.81 plus interest on the previous loan of $22.19, totaling $490. This figure remains unchanged in defendant's subsequent correspondence. The letter of May 21 went on to say that for a cash payment of $930, Loss could borrow enough to pay two semi-annual premiums and keep the policy in force for another full year, i. e., until May 18, 1959.

The thirty-one day grace period expired on June 18, 1958. Loss had not paid the premium and had not arranged for a loan. On June 23, 1958 defendant sent to him a mimeographed form letter reminding him that the sum of $1,285.69 due on May 18 had not been received, expressing the thought that it might have been overlooked, and stating that "we will accept your payment without any further requirements if sent to us by July 2, 1958 (provided the insured is alive)." On June 25 the manager of defendant's branch office wrote again to Loss saying that he had been informed that the policy had lapsed for non-payment of premium due May 18 but that it could be "reinstated" on or before July 2, 1958 and urging Loss to give serious consideration to this offer. Loss made no reply to this letter. He did not pay the premium or arrange for a loan. On July 15, 1958, he died.

The policy, under the heading "Options on Lapse," provides that if a premi-

um is not paid by the end of the grace period, Option C shall become effective, unless other options are elected, presumably by the insured, which they were not in this case. Option C provides for the continuance of the policy from the due date of the defaulted premium as "paid-up non-participating term insurance," the amount of which shall be the "face amount plus any existing dividend additions and deposits, less any indebtedness." The duration of such extended term insurance shall be "such as the cash value less any indebtedness shall provide when applied as a net single premium." Defendant proceeded to apply this provision. It determined that the amount of the extended term insurance to which Loss was entitled was $48,905 and that the "cash value less any indebtedness" of Policy No. 823–57–67 (referred to as Loss's "equity" in the policy), was $4.86. When applied "as a net single premium" this was sufficient to maintain the extended term insurance in the amount of $48,905 in force for three days, i. e., from May 18, 1958 to May 21, 1958. Defendant did not notify Loss in his lifetime that it had set up this extended term insurance for him, for the necessary bookkeeping was still in process when Loss died, and by that time the extended term insurance had already expired.

■ There is New York authority to the effect that a default in the payment of a premium occurs on the date when the premium falls due and is not paid. The grace period is merely a waiver of the consequences of the default for thirty-one days. It does not alter the due date. Hand v. Equitable Life Assurance Society of the United States, 251 App.Div. 321, 296 N.Y.S. 543 (1st Dept. 1937).

It makes no difference in the outcome of this case whether the default occurred on May 18, 1958 in accordance with this rule, or whether it occurred on June 18, when the grace period expired. I will accept the earlier date as the correct one. Policy No. 823–57–67, therefore, lapsed on May 18, 1958 and

plaintiff, as its beneficiary, has no rights thereunder, unless this result is prevented by one or more of the various theories which plaintiff here advances. The extended term insurance also lapsed before the death of the insured, unless plaintiff is correct in the contention which she makes in this regard, which will be considered hereinafter.

Plaintiff's first contention is that defendant did not properly apply the terms of the policy when it advised Loss that he would need to pay $490 in order to satisfy the premium due on May 18. Plaintiff asserts that in fact no additional cash was needed for that purpose, and that if Loss had been so informed, he would have arranged for a policy loan in order to keep the policy in force. To evaluate this contention, certain provisions of the policy must be examined.

The policy contains a "Table of Cash, Loan and Other Values" which is prefaced by the following legend:

"These values apply on the policy anniversaries indicated, assuming that all premiums up to such anniversaries have been paid and that there are no dividends or indebtedness. Values at other times will be furnished on request."

The heading further states that the cash value is also the loan value "subject to loans section," i. e., except as provided in the section of the policy which contains the loan provisions.

There follows a table specifying the cash value on the first policy anniversary, for a period of 25 years after the original policy date. According to this table the cash value on the first policy anniversary, i. e., May 18, 1958, is $1,100 and on the second, i. e., May 18, 1959, is $2,750.

The section of the policy pertaining to loans states that loans may be obtained "at any time while this Policy has a cash value"; that the loan will be "for any amount not exceeding the loan value"; and that the loan value is "the amount which, with interest at 5% a year, shall equal the cash value of this Policy on the next policy anniversary or,

in the case of an automatic premium loan, on the next premium due date if that is earlier."

The policy contains provisions for an automatic premium loan to take effect when a premium is in default on the last day of the grace period. No such automatic loan comes into being, however, unless "the loan value is at least as great as the entire premium plus any existing indebtedness." If it is not, "Options on Lapse," the pertinent parts of which I have already quoted, shall apply.

It appears to be conceded that the automatic premium loan device was not available to prevent the lapse of this policy. The "next premium due date" after the expiration of the grace period would be November 18, 1958. The cash value for that date is not shown in the table, since the table lists only annual, not semi-annual, values, but it is stipulated that the loan value, i. e., the cash value, discounted at 5 per cent, was $1,-885.48. The premium due on May 18, 1958 was $1,263.50 and Loss's existing indebtedness on his December 1957 loan was $1,095.14 (consisting of principal of $1,072.95 and interest of $22.19). The total of $2,358.64 thus substantially exceeded the loan value.

When Loss inquired how much he could borrow to pay the premium due on May 18, 1958, defendant eventually advised him, after correcting its figures, that he need pay only $490. This is approximately the amount by which the total premium plus indebtedness exceeded the loan value as shown by the stipulated figures.*

Defendant further advised Loss that if he wished to borrow to pay two premiums, i. e., those due on May 18, 1958 and on November 18, 1958, he could do so by paying $930. This is the amount by which, according to defendant's computations, two premiums plus the ex-

isting indebtedness exceeded the loan value on May 18, 1959.

Plaintiff takes issue with the theory of these computations, although she does not challenge the accuracy of the arithmetic. She points to the fact that the policy, when speaking of an automatic premium loan, refers to the loan value on the "next premium due date," but that otherwise it refers to the loan value "on the next policy anniversary." There is a difference in the two dates in this case, for since the premiums were payable semi-annually, the "next premium due date" after May 18, 1958 would be November 18, 1958, but the "next policy anniversary" would be May 18, 1959. Plaintiff argues that in computing the amount necessary to pay the premium due on May 18, 1958, defendant should have based its computation on the loan value of May 18, 1959, rather than on that of November 18, 1958, and that since the loan value on May 18, 1959 was considerably higher than the value six months earlier, a computation based on the higher value would have produced the result that no payment by the insured was needed in order to satisfy the premium due on May 18, 1958.

This argument ignores the fact that the loan and cash values are computed, as the heading of the table clearly indicates, on the assumption that all premiums up to the respective dates of those values have been paid. Thus, the loan or cash value for November 18, 1958 is higher than that for May 18, 1958, and the value for May 18, 1959, in turn, is higher than that for November 18, 1958, because of the fact that payment of the premium in the intervening period builds up the value to the higher figure. Consequently, when the problem is to determine the amount of cash which the insured must contribute to pay one premium, i. e., that due on May 18, 1958, the language at the head of the table indicates that the computation is to be based

---

\* The exact difference between $2,358.64 and $1,885.48 is $473.16. How defendant finally arrived at a figure of $490 was never explained, but the discrepancy seems immaterial.

on the loan value of November 18, 1958 and that one premium is to be deducted therefrom. When the problem is to determine the amount of cash needed to pay two premiums, the computation is to be based on the loan value of May 18, 1959 and two premiums are to be deducted. This is what defendant did. Plaintiff would like to make use of a part of each computation, in each case the part favorable to her. She would like to use the minuend which is the higher of the two and deduct from it the subtrahend which is the smaller of the two. Specifically, she would use the May 18, 1959 loan value as the base figure, and would deduct from it only one semi-annual premium, not two.

In my opinion the policy does not require the employment of such a peculiar method. It is entirely clear that defendant properly computed the amount which the insured would need to contribute in order to satisfy two premiums, those due on May 18 and on November 18. Defendant used the loan value on the "next policy anniversary," i. e., May 18, 1959, and deducted therefrom two premiums. This is strictly in accordance with all the terms of the policy. The difficulty arises with the computation of the amount which the insured would need to contribute in order to satisfy only one premium, i. e., that due on May 18. Defendant applied the same principle in this computation as in the other. In this instance, it used the loan value on November 18, 1958 as the base and deducted from it one premium. In other words, defendant made for this purpose the same computation as has been made for the purpose of determining whether the automatic premium loan could take effect.

Plaintiff concedes that this method was correct as far as an automatic loan is concerned, because the loan section of the policy says that for this purpose the next "premium due date" is to be used as the base figure. But she argues that the method is incorrect for a loan that is not automatic, because for that purpose the policy says that the base figure shall be the loan value "on the next

policy anniversary." It is undeniable that this difference in wording exists, but nevertheless, I feel confident that no such difference in result was intended. It seems absurd to say that the amount needed to pay the premium due on May 18, 1958 is one sum if it is paid by a loan which is automatic, but is a different sum if it is paid by a loan which is negotiated. It is the same premium in either case, and it must be that the same sum will pay it, whatever form the loan takes. Otherwise the result would not only be illogical, but it would conflict with the principle expressed in the heading of the table, which leaves no room for doubt that all unpaid premiums up to whatever date is used must be deducted from the loan value in order to compute the amount which the insured must pay. I hold, therefore, that the policy does not require computation of the amount in the way that plaintiff claims.

An argument could be made that because the loan section of the policy, in the case of a non-automatic loan, refers only to the loan value on the next policy anniversary, it follows that where premiums are paid semi-annually, no provision is made for a non-automatic loan to pay only one semi-annual premium, and that the policy contemplates only a loan to pay two semi-annual premiums at once. This is what the language of the loan section literally seems to mean. But such a reading would seem to be inconsistent with the provision that a loan may be obtained "at any time while this policy has a cash value." It is unnecessary to decide the question in this case. For even if the policy does not require defendant to lend only enough to pay one semi-annual premium, I see nothing which prevents it from doing so if it so desires. Defendant was willing to do so here, and since it correctly computed the amount which the insured would need to contribute for that purpose, plaintiff has no just cause for complaint.

Plaintiff also seems to contend that even if her construction of the pol-

icy is wrong, defendant is in some way estopped to dispute it. Her argument appears to depend on the fact that under the policy defendant has the right to require that "all unpaid premiums due before the next policy anniversary" be paid out of the proceeds of any loan it may grant. Plaintiff then appears to argue that since, in computing the amount which Loss would need to pay, defendant took into account only the premium due on May 18, it thereby manifested its willingness to make a loan without requiring that both premiums due before the next policy anniversary be paid, and that therefore, defendant may not now be heard to question the method of computation for which plaintiff contends.

This theory is wholly without merit. As I have already pointed out, the correct construction of the policy, in my opinion, is that if defendant lends to the insured to enable him to pay one semi-annual premium, it may require him to pay that premium out of the proceeds. If it lends to enable him to pay two semi-annual premiums, it may require him to pay both premiums out of the proceeds. Defendant was willing to make either loan. It was consistent in the principle which it followed in computing the amount which the insured would need to supply in either case. I see no basis for any claim that defendant waived its rights or that it is in any way estopped to dispute plaintiff's construction of the policy language.

■ Finally, plaintiff mentions the fact that defendant made mathematical errors in the first instance and twice changed the figure which it told the insured he would need to contribute. Although this is true, I see no relevance to it. Defendant advised the insured of the correct figure on May 21, 1958. Defendant would have accepted payment at any time until July 2, 1958. The insured thus had ample opportunity to pay the amount needed to keep the policy in force. Where there is no evidence of injury to the insured by reason of an error on the part of the insurer, the in-sured has no basis for recovery. Nederland Life Insurance Co. v. Meinert, 199 U. S. 171, 26 S.Ct. 15, 50 L.Ed. 139 (1905).

■ In the final analysis, none of plaintiff's arguments on this branch of the case has any real relevance. The fact is that Loss did not accept defendant's offer to make a loan and did not pay anything to defendant with respect to the May 18, 1958 premium, despite the fact that he was several times invited to do so. There is no evidence as to why he did not. For all we know, he may have deliberately decided to let the policy lapse. There is nothing to show that anything that the defendant said or did affected his conduct in any way.

■ Plaintiff's second contention is that defendant was under a statutory duty, as well as a duty under the policy, to give notice to the insured that his loan indebtedness, plus interest, equaled or exceeded the loan value of the policy. Plaintiff argues that the effect of defendant's failure to give such notice was that the policy continued in force. The argument is based on Insurance Law, McKinney's Consol.Laws, c. 28, § 155, subd. 1(g), dealing with standard provisions in life insurance policies, which provides in part:

"The policy may further provide that if the interest on the loan is not paid when due, it shall be added to the existing loan, and shall bear interest at the same rate; and may further provide that if and when the total indebtedness on the policy, including interest due or accrued, equals or exceeds the amount of the loan value thereof at such time, and if at least thirty days' prior notice shall have been given in the manner provided in section one hundred fifty-one, then the policy shall terminate and become void."

This policy contained such a provision. Concededly, no notice to this effect was ever sent. But defendant does not attempt to avoid the policy on the ground that insured's indebtedness equaled or

exceeded the loan value. Rather, defendant's sole contention is that the policy lapsed for failure to pay the premium. Thus, the statute and this clause of the policy have no application here. Manufacturers' Trust Company v. Equitable Life Assurance Society of the United States, 244 App.Div. 357, 279 N.Y.S. 457 (1st Dept. 1935); Mayers v. Massachusetts Mutual Life Insurance Company, 11 F.Supp. 80 (E.D.N.Y.1935), aff'd, 77 F.2d 1007 (2d Cir. 1935), cert. denied, 296 U.S. 594, 56 S.Ct. 108, 80 L.Ed. 420 (1935).

■ Plaintiff's third contention is that the "Notice of Amount Due" sent by defendant to the insured on April 30, 1958, does not conform to the requirements of Insurance Law § 151. Subsection 1 of that statute provides:

"No life insurance policy or noncancellable disability insurance contract hereafter delivered or issued for delivery in this state shall terminate or lapse by reason of default in payment of any premium, installment, or interest on any policy loan in less than one year after such default, unless a written or printed notice as provided in subsection two, shall have been duly addressed and mailed at least fifteen and not more than forty-five days prior to the day when such premium, installment or interest becomes due * * *."

Subsection 2(c) provides:

"The notice required by subsection one shall * * * state the amount of such premium, installment, or interest * * *."

Plaintiff contends that the notice sent by defendant on April 30 did not correctly state the amount of the premium because it did not indicate what the loan value of the policy was. Plaintiff says that the duty to inform the insured of the loan value of his policy arises because of the automatic premium loan provision of the policy.

It is manifest that the statute does not expressly require that the loan value of the policy be specified in the notice.

Plaintiff's theory is that where a policy provides for an automatic premium loan, this so affects the premium that the notice does not accurately state its amount unless the notice also specifies the loan value. There is no authority to support this proposition, and it does not impress me as sound. I see no ambiguity in the word "premium." It is the amount which must be paid in some fashion to keep the policy in force. For obvious reasons, the statute requires that the insured be notified of this amount. It then rests with him whether to pay it or not, and whether to pay it out of his own pocket or to borrow for that purpose. If he wishes to borrow, he can ascertain the loan value by inquiry of the insurance company, just as Loss did in this case. There seems to be no necessity for the insurance company to advise him of this value unless he asks. The wording of the statute is so plain that there is no room for reading into it a phrase which it does not contain.

Plaintiff argues that the insurer must inform the insured of the amount of dividends to the credit of the policy and that therefore it must also advise him as to the loan value. We may assume that the premise of this argument is correct, as some old New York cases indicate. Meyer v. Knickerbocker Life Insurance Co., 73 N.Y. 516 (1878); Meeder v. Provident Savings Life Assurance Society of New York, 58 App.Div. 80, 68 N.Y.S. 518 (1st Dept. 1901), aff'd, 171 N.Y 432, 64 N.E. 167 (1902).

The conclusion, however, does not follow. Dividends are the property of the insured, whereas the loan value represents a reserve fund which is the property of the insurer. Considered as a general proposition, there may well be a duty to inform the insured as to the former, and not as to the latter. See General American Life Insurance Co. v. Butts, 193 Ga. 350, 18 S.E.2d 542, 140 A.L.R. 677 (1942); Aetna Life Insurance Co. v. Eilers, 367 S.W.2d 732 (Tex. Civ.App. 1963).

In any event, we are not concerned here with what the common law doctrine

is or should be. The only question is whether Section 151 of the Insurance Law requires that this information be furnished. Plaintiff's argument as to dividends does not relate to the statute and does not affect my conclusion as to its meaning.

█ Plaintiff's last contention is that since there was ample cash value in two other wholly separate policies which defendant had issued on the life of this insured, defendant should have applied the available funds in these policies to the payment of the premium on the policy in question. Plaintiff asserts that defendant should have so acted even without authorization from the insured.

This argument has been explicitly rejected by the New York courts. Aronson v. New York Life Insurance Co., 258 App.Div. 888, 16 N.Y.S.2d 213 (2d Dept. 1939), aff'd, 283 N.Y. 652, 28 N.E.2d 46 (1940) ; Manufacturers' Trust Company v. Equitable Life Assurance Society of the United States, 244 App.Div. 357, 279 N.Y.S. 457 (1st Dept. 1935).

In the Manufacturers' Trust Company case, the court said that if the insurer had applied accumulated dividends in a policy to the payment of a premium on that policy, without the consent of the insured, the insurer "would have been liable to him for this unauthorized appropriation of his property." The same principle applies even more strongly to an unauthorized use of the cash value of an entirely separate policy.

█ Apart from all this, plaintiff further asserts that even if the policy lapsed, the extended term insurance should have been in force on July 15, 1958 when Loss died. Her theory is that in determining the amount available to purchase this extended insurance, defendant was not entitled to deduct the 1957 loan because defendant had not given to the insured notice that the indebtedness on this loan had, or in a few days would have, exceeded the loan value on May 18. The policy does not require such a notice under the circumstances. The New York cases on the point are contrary to plaintiff's position. Borgers v. Travelers Insurance Co., 261 App. Div. 310, 25 N.Y.S.2d 464 (2d Dept. 1941) ; Manufacturers' Trust Company v. Equitable Life Assurance Society of the United States, supra; 6 Couch on Insurance 2d, § 32:240, p. 474 (1961).

█ I conclude that the amount and duration of the extended term insurance was properly computed by defendant.

I conclude that there is no merit to any of the theories which plaintiff has advanced in her effort to avoid the inevitable consequences of the insured's failure to pay the premium due on May 18, 1958. Because of that failure, the policy lapsed. The extended term insurance expired before the insured's death. Consequently, plaintiff has not proved any claim on which relief can be granted in this action.

Pursuant to Rule 52(a), this opinion constitutes the court's findings of fact and conclusions of law.

Defendant's motion to dismiss the complaint is granted. The Clerk is directed to enter judgment accordingly. So ordered.